UNITED STATE DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| **MICHAEL BRANDON VICKERS** | * | **CIVIL ACTION NO.** |
| | * | |
| **versus** | * | **SECTION:** |
| | * | |
| **BP EXPLORATION & PRODUCTION, INC.,** | * | **MAGISTRATE:** |
| **BP AMERICA PRODUCTION COMPANY,** | * | |
| **and BP P.L.C.** | * | |

*************************************************************************

## I.  PARTIES

1.     Plaintiff, Michael Brandon Vickers, (hereinafter "Plaintiff") is a person of the full age of majority and a citizen and resident of the State of Alabama.

2.     Plaintiff is an individual who was injured as a result of the exposure to oil and/or oil-dispersing chemicals and/or decontaminants by virtue of his employment as a clean-up and/or response worker, by virtue of his employment in and around the navigable waters of Mississippi.

3.     Defendant, BP Exploration & Production, Inc. (hereinafter "BP Exploration") is a Delaware corporation with its principal place of business in Warrensville, Illinois.  BP Exploration was a leaseholder and the designated operator in the lease granted by the former Minerals Management Service (hereinafter "MMS") allowing it to perform oil exploration, drilling, and production-related operations in Mississippi Canyon Block 252, the location know as "Macondo," where the oil spill originated.[1]  BP Exploration was designated as a "responsible party" by the U.S. Coast Guard under the Oil Pollution Act of 1990 (hereinafter "OPA"), 33 U.S.C. § 2714.

---

[1] The MMS, a federal entity that divides the Gulf of Mexico's seafloor into rectangular "blocks," and then auctions the rights to drill for oil and gass beneath those blocks of seafloor, was reorganized as the Bureau of Ocean Energy Management, Regulation, and Enforcement (BOEMRE) on June 18, 2010; however, it is referred to as the MMS throughout this document.

1

4.      Defendant, BP America Production Company (hereinafter "BP America") is a Delaware corporation with its principal place of business in Houston, Texas. BP America was the party to the drilling contract with Transocean Ltd. for the drilling of the Macondo well by the *Deepwater Horizon* vessel.

5.      Defendant, BP P.L.C., is a British public limited company with its corporate headquarters in London, England. BP P.L.C. is a global parent company of the worldwide business operating under the "BP" logo. BP. P.L.C. is one of the world's largest energy companies, with over 80,000 employees and $239 billion revenues in 2009. BP P.L.C. operates it various business divisions, such as the "Exploration and Production" division in which BP Exploration and BP America fall, through vertical business arrangements aligned by product or service groups. BP P.L.C.'s operations are worldwide, including in the United States. Defendants, BP Exploration and BP America are wholly-owned subsidiaries of BP P.L.C. and are sufficiently controlled by BP P.L.C. so as to be BP P.L.C.'s agents in Louisiana and the U.S. more generally.

6.      BP P.L.C. states that it is the leading producer of oil and natural gas in the United States and the largest investor in U.S. energy development. A sampling of BP P.L.C.'s contacts with the U.S. are as follows: (a) BP P.L.C.'s American Depository Shares are listed on the New York Stock Exchange (hereinafter "NYSE") and BP P.L.C. is the largest non-U.S. company listed on the NYSE; (b) roughly 40% of BP's shares are owned by U.S. individuals and institutions; ( c) BP P.l.C. files annual reports with the U.S. Securities and Exchange Commission; (d) approximately 60% of BP P.L.C.'s fixed assets are located in the U.S. or the European Union; and (e) BP P.L.C. reports having 2,000 U.S.-based employees in non-Exploration and Production, non-Refining and Marketing BP entities.

7.     BP Exploration, BP America and BP P.L.C. are generally referred to herein collectively as "BP."  As lease operator of the Macondo prospect site, BP was responsible for assessing the geology of the prospect site, engineering the well design, obtaining regulatory approvals for well operations, and retaining and overseeing the contractors working on the various aspects of the well and the drilling operations.

## II.  JURISDICTION AND VENUE

8.     Jurisdiction exists before this Court pursuant to Article II, Section 2 of the United States Constitution, which the federal judiciary to hear "all Cases of admiralty and maritime Jurisdiction."

9.     In addition, this Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1333, and the Admiralty Extension Action 46 U.S.C. § 30101.

10.    This Court has personal jurisdiction over BP Exploration and BP America because each is registered to do business in Louisiana, does business in Louisiana, and has a registered agent in Louisiana.

11.    This Court may exercise personal jurisdiction over BP P.L.C. pursuant to Rule 4(k)(2) of the Federal Rules of Civil Procedure, the federal long-arm jurisdiction provision, because claims in this action arise under federal law, the exercise of jurisdiction over BP P.L.C. is consistent with the United States Constitution and laws, BP P.L.C. will be served with a summons and this Complaint.

12.    This Court has jurisdiction over BP P.L.C. pursuant to Louisiana's long-arm statute (La. Rev. Stat. Ann. § 13:3201(B), in combination with Rule 4(k)(1)(A) of the Federal Rules of Civil Procedure.  Plaintiff's causes of action arise out of wrongful contact committed by BP P.L.C., directly or indirectly by its agents, which caused injury or damage in Louisiana by an offense and/or

quasi-offense committed through an act or omission outside of Louisiana.  These act or omissions took place both before the blowout resulting in the oil spill, which is described more fully below, and in the negligent conduct of BP P.L.C. after the blowout in attempting to contain the spill,  BP P.L.C. regularly does or solicits business, or engages in any other persistent course of conduct, or derives revenue from goods used or consumed or services rendered in Louisiana.  BP P.L.C. has had continuous and systematic contact in Louisiana (and with the United States more generally).

13.     In addition, this Court also has personal jurisdiction over BP P.L.C. under agency principles because BP P.L.C.'s agents, BP America and BP Exploration, do business in Louisiana. In BP P.L.C.'s Annual Report for 2009, in which its presents a consolidated financial statement that includes BP America and BP Exploration, BP P.L.C. states that it "controls" both BP America and BP Exploration, among other subsidiaries, meaning that it has "the power to govern the financial operating policies of the [subsidiary] so as to obtain benefit from its activities...."

14.     BP P.L.C.'s direct, joint and/or assumed responsibility and/or liability for safety and well control, both before and/or after the explosions and blowout on April 20, 2010, is further evidenced by the announcement of the Macondo Project on the BP website hosted and copyrighted by BP P.L.C., the publication of information concerning the casualty and spill on the BP website hosted and copyrighted by BP, the express and/or implied acceptance of responsibility for safety of BP operations in North America and the Gulf of Mexico in statements by officers of BP P.L.C., the presence (upon information and belief) of a BP P.L.C. officer or employee on the *Deepwater Horizon* for the celebration that occurred shortly before the explosions and fire, the direct participation of BP P.L.C. employees in the post-casualty investigations, the direct participation of BP P.L.C. officers employees in the post-casualty well-control efforts, and the direct participation of BP P.L.C. in the establishment and/or funding of the Escrow Fund and/or Gulf Coast Claims

Facility.

15. Venue is appropriate in this District under 28 U.S.C. § 1391, because the events or omissions giving rise to the claims asserted herein occurred in this District.

16. The amount in controversy exceeds $75,000.00 exclusive of interests and costs.

### III.  FACTUAL ALLEGATIONS

**A.  The *Deepwater Horizon* Catastrophe**

17. The *Deepwater Horizon* was an ultra-deepwater dynamic positioned semi-submersible oil vessel built in 2001.  It was one of the largest vessels of its kind.

18. BP leased the *Deepwater Horizon* through Sepetember 2013 to drill exploratory wells at Macondo prospect site in Mississippi Canyon Block 252, a location on the Outer Continental Shelf off the coast of Louisiana.

19. On April 20, 2010, the workers on the *Deepwater Horizon* oil rig lost control of the Mancondo well just after the final cementing work was completed.  During the course of the cementing work, an explosion occurred on the *Deepwater Horizon* and it caught fire.

20. The explosion and fire caused the deaths of eleven (11) people and injures of many other workers on the vessel.  After burning for two (2) days, the vessel sank to the ocean floor.

21. The *Deepwater Horizon* has been connected to the wellhead at the seafloor by a 5,000 foot pipe called a riser.  As the *Deepwater Horizon* tipped into the sea, it pulled the riser down with it, bending and breaking the pipe.  Oil flowed from the now-open end of the riser, as well as through two breaks along its length.  An emergency valve, installed on the wellhead for just such a disaster, failed to seal the wellhead as it should have, causing the blown-out well to spew oil into the Gulf waters (the "Oil Spill").

22.     Crude oil was discharged before the *Deepwater Horizon* finally sank on April 22, 2010, and the rate of discharge increased once the *Deepwater Horizon* sank to the ocean floor.

23.     After the explosions, BP attempted to downplay and conceal the severity of the Oil Spill.  Government investigators have found BP's initial leak estimate of 1,000 barrels per day to be a fraction of its measured leakage amount, which in fact exceeded 50,000 barrels per day.  Additionally, an internal BP document from around the time of the spill shows that the company's own analysis had actually estimated that the rate of oil spillage could reach 100,000 barrels, or 4,200,000 gallons per day.

24.     Each day during the course of the Oil Spill, tens of thousands of barrels of crude oil gushed from the wellhead and broken riser, bubbling up to the surface and flattening out into a widening slick of oil, as well as spreading out in vast subsurface plumes.  On the surface, the shifting mass was large enough to be visible from outer space, at times covering tens of thousands of square miles, and spreading with the wind and currents towards the Gulf States coastlines.

25.     Beginning on or about April 30, 2010, oil made landfall along the Gulf Coast on white sand beaches, leased and privately owned subsurface areas, and in ecologically sensitive marshes and estuaries.  Under water, immense plumes of oil and dispersant chemicals swirled through the entire water column, damaging ecosystems throughout the Gulf of Mexico.

26.     The oil spewed from the well for over twelve (12) weeks until BP finally capped the well on July 15, 2010. Ultimately, almost five million barrels (210 million gallons) of crude oil spilled in the Gulf of Mexico.

27.     The crude oil carried with it significant public health risks.  Crude oil has many highly toxic chemical ingredients that can damage every system in the body.

### B. The Response Effort and the Use of Chemical Disperants

28.     In the wake of the disaster, and pursuant to its duties BP began implementing a program to attempt to prevent the gushing oil from reaching the shores of the Gulf states.  This disaster response plan had three primary components: offshore containment; shoreline protection; and subsea response.

29.     As part of its offshore containment response program, BP directed the use of vessels to, *inter alia,* recover oil coming to the surface of the Gulf of Mexico; skim oil from the surface of the water; and conduct in-*situ* burning of oil that had reached the surface of the water.  BP also employed vessels to tow and deploy booms-floating barriers intended to contain, deflect, or hold back oil floating in the water's surface.

30.     In addition, BP's response plan included the use of chemical dispersants that were intended to break down the oil into finely dispersed droplets.

31.     The dispersants used by BP are know to cause, *inter alia,* headaches; nausea; vomiting; diarrhea; abdominal pains; dizziness; chest pains and tightness; irritation fo the skin, eyes, nose, throat and lung; breathing difficulties and respiratory system damage; asthma attacks; hypertension; damage to the liver and kidneys; central nervous system depression; neurotoxic effects; damage to red blood cells; genetic damage and mutations; reproductive and development damage; immune system damage; cardiac arrhythmia; cardiovascular damage; and increased severity of chronic obstructive pulmonary disease.

32.     To date, BP and its contractors have used more than 1.8 million gallons of chemical dispersants in the Gulf of Mexico in connection with the Oil Spill.

### C. Plaintiff's Exposure to Oil and Harmful Chemicals and their Resulting Injuries and Damages

33.     Between July 1, 2010 and August 6, 2010, Plaintiff was employed by Knight's Marine & Industrial Services, Inc., as a foreman to assist in the *Deepwater Horizon* clean-up and response activities.  Knight's was subcontracted by an entity hired by BP to assist in the clean-up and remedial efforts.  In this capacity, Plaintiff was exposed to oil and dispersants.

34.     Each morning of work as an employee of Knight's, the plaintiff would meet his fellow co-workers at the Mississippi office location of Knight's. The plaintiff and his co-workers would then occasionally load a trailer with their work material consisting of the fence panels, fence supports, tools, etc.  On other days the trailer was already loaded with the fence panels, fence supports, tools, etc.  The plaintiff would then take his own vehicle or, on a few occasions ride over to the boat launch in a work van.  When the plaintiff and his co-workers reached the boat launch at Galvatine Bayou they would off load the aforementioned work materials on to a work barge,  board the crew board and ride to their work site which was in Galvatine Bay at the end of Landier Road in Gautier, Mississippi.  A push boat would push the work barge loaded with materials to the work site.

35.     Upon their arrival at the work site in Galvatine Bay, Mississippi, the plaintiff and his co-workers began their task of building a protective fence made to block the crude oil in the waters from the oil spill from reaching land or wet lands.  The materials to build this protective fence was made of fabric and metal fencing and metal supports.  During the work day the aforementioned materials were stored on a work barge at the work site in the Galvatine Bay, Mississippi.

36. A work day of building this protective fencing was 10-12 hour days in waist to chest deep water contaminated with chemicals, crude oil and oil disperants, only to take a break for lunch, which was eaten on the push boat.  Plaintiff had to purchase his own hand sanitizer to wash his

8

hands prior to eating lunch, as it was not provided by BP or Knight's. At the end of a work day the plaintiff and his co-workers would board the crew boat and follow the push boat and work barge back to the boat launch in Galvatine Bayou, Mississippi.

37. At all material times hereto, the Plaintiff worked as a crew member of the crew onboard a crew boat and push boat which was owned, provided, supplied, leased, and/or chartered by Knight's. During this time Plaintiff was not instructed or allowed to wear a haz-mat suit, face mask or respirator and the crew boat and push boat was not furnished with the aforementioned safety equipment notwithstanding its proximity to heavily polluted waters.

38. While employed by Knight's, Plaintiff was unnecessarily exposed to crude oil and chemical dispersants for approximately 5 weeks.

39. In additional to the exposure suffered onboard the crew boat and push boat, Plaintiff was exposed to the crude oil and chemical dispersants while sailing in and around the navigable waters in the Gravaline Bay in Mississippi.

40. As a result of his exposure to the crude oil and chemical dispersants, Plaintiff began to suffer from a myriad of physical symptoms including, but not limited to, breathing difficulties, kidney problems, skin peeling, skin rashes, skin irritation, respiratory problems, muscle cramps, muscle spasms, swollen testicles, chest pains, heart racing, headaches, vision problems and problems with his left leg giving out on him. Since his chemical exposure, Plaintiff continues to suffer from the aforementioned symptoms. The chemical exposure Plaintiff suffered has greatly diminished his opportunities to make a living and his quality of life.

### D. BP's Willful and Wanton Conduct

41. BP focused primarily on profit and disregarded public and environmental health and safety while undertaking ultra-hazardous activities on the *Deepwater Horizon* by, among other

9

things:

    a.    performing a critical well pressure test with untrained and unqualified personnel and callously ignoring and/or misinterpreting abnormal "red flag" pressure test results;

    b.    using a well design with too few barriers to gas flow;

    c.    failing to use a sufficient number of "centralizers" to prevent channeling during the cement process;

    d.    failing to run a bottoms-up circulation of the drilling mud prior to beginning the cement job;

    e.    failing to run a cement bond log to evaluate the integrity of the cement job;

    f.    failing to deploy the casing hanger lockdown sleeve prior to commencing the mud displacement process in the well;

    g.    using an untested, abnormally large volume of mixed spacer solutions to avoid having to properly dispose of the two separate space substances as hazardous wastes;

    h.    grossly inadequate maintenance, and reckless and improper operation and use of the blowout preventers appurtenant to the *Deepwater Horizon*;

    i.    failing to ensure that oil would expeditiously and adequately be contained within the immediate vicinity of the *Deepwater Horizon* in the event of a blowout;

    j.    failing to ensure the adequate safeguards, protocols, procedures and resources would be readily available to prevent and/or mitigate the effects of an uncontrolled oil spill; and

    k.    failing to use reasonably safe dispersant chemicals in the attempt to respond to the Oil Spill.

    42.    BP's corporate culture caused and allowed it to disregard the lessons it should have

learned and applied from previous incidents at it facilities that resulted in extensive damage and loss of life; instead, it continued to place others at risk in the interests of cost-cutting and financial gain.

43. In addition, after the blowout and before the well was finally sealed, BP was aware of procedures that would immediately block the flow of oil into the Gulf, yet it delayed the implementation of any such procedures, and limited its efforts to plug the well to options that would salvage the well for future use, instead of selecting procedures that would stop the flow of the oil as soon as possible regardless of the well's continued functionality. As such, BP increased the magnitude of, and the damage caused by, the spill by willfully, wantonly, and/or recklessly choosing its profits over the lives of the workers on the vessel, the safety of the environment, and the health, welfare, and value of the people, businesses, and property of the Gulf states.

44. BP, by its conscious and/or deliberate unreasonable acts and/or omissions complained of herein, displayed gross negligence, reckless indifference, willfulness, and/or wantonness.

## IV. CAUSES OF ACTION

### A. CAUSE OF ACTION AS TO BP (NEGLIGENCE UNDER GENERAL MARITIME LAW)

45. Plaintiff realleges each and every allegation set forth in all preceding paragraphs as if fully stated herein.

46. The existence and breach of Defendant BP's legal duties are established under general maritime law.

47. At all times material hereto, BP owed duties of ordinary and reasonable care to Plaintiff in connection with the drilling operations and maintenance of the *Deepwater Horizon*, including it appurtenances and equipment. BP additionally owed duties to guard against and/or prevent the risk of an oil spill and to mitigate the harm if an oil spill did occur.

48.     Further, BP owed duty to Plaintiff to exercise due care in the operation, maintenance, handling, design, implementation and execution of the relief and recovery measures.

49.     BP had a heightened duty of care to Plaintiff because of the great danger associated with exposure to oil, dispersants and/other hazardous chemicals.

50.     The risk of injury and loss to Plaintiff was reasonably foreseeable, and BP knew of the dangers associated with deep water drilling.  Specifically, at all time relevant to this litigation, BP knew or should have known that:

    a.   crude oil contains chemicals hazardous to human health;

    b.   chemical dispersants contain chemicals hazardous to human health;

    c.   Plaintiff should have been adequately and timely warned of the harmful effects of crude oil and chemical dispersants, and the hazardous substances that they contain; and

    d.   failure to exercise reason able care in the operation, maintenance, handling, design, implementation and execution of the relief and recovery measures would result in harm to Plaintiff.

51.     BP breached its duty of care to Plaintiff in the following non-exclusive respects:

    a.   failing to prevent the explosion on board the *Deepwater Horizon*;

    b.   failing to cap the Macondo well in a timely manner;

    c.   failing to warn Plaintiff, public officials, and government agencies of the harmful effects of crude oil, chemical dispersants and any mixture thereof, and the hazardous chemicals they contain;

    d.   failing to conform to the provision of the National Contingency Plan relating to the use of aerial chemical dispersants in the proximity of vessels and shallow waters;

    e.    failing to coordinate and conduct aerial spraying sorties in a manner so as to eliminate the risk of vessels and crew members being exposed to aerial chemical dispersants; and

    f.    failing to otherwise exercise reasonable care in the operation, maintenance, handling, design, implementation and execution of the relief and recovery measures.

52. Defendants' breach of their duties posed an unreasonable risk of harm to Plaintiff.

53. Plaintiff suffered injury, loss and damages as a direct and proximate result of Defendants' willful, wanton, reckless, and/or grossly negligent breach of their aforementioned duties and, therefore, Plaintiff is entitled to recover actual and punitive damages.

### B. FOR A FOURTH CAUSE OF ACTION AS TO BP (GROSS NEGLIGENCE UNDER THE GENERAL MARITIME LAW)

54. Plaintiff realleges each and every allegation set forth in all proceeding paragraphs as if fully restated herein.

55. BP had a heightened duty of care to Plaintiff because of the great danger associated with exposure to oil dispersants, and/or hazardous chemicals.

56. BP breached their legal duty to Plaintiff and failed to exercise reasonable care and acted with reckless, wilful, and wanton disregard in their negligent failure to prevent and contain the Oil Spill.

57. BP knew or should have known that their wilful, wanton, and reckless conduct would cause injury to Plaintiff.

58. Plaintiff's injury and damages were caused by Defendants' wilful, wanton, and reckless, and/or grossly negligent conduct and, therefore, Plaintiff is entitled to recover actual and punitive damages.

### C. FOR A FIFTH CAUSE OF ACTION AS TO BP (NEGLIGENCE PER SE UNDER GENERAL MARITIME LAW AND FEDERAL LAW)

59. Plaintiff realleges each and every allegation set forth in all preceding paragraphs as if fully stated herein.

60. BP's conduct with regard to the manufacture, maintenance and/or operation of oil-drilling vessels such as the *Deepwater Horizon*, the release of hazardous and toxic chemicals into the environment, and the application of dispersants and other hazardous chemicals is governed by federal laws and permits issued under the authority of these laws. These laws and permits create statutory and regulatory standards that are intended to protect and to benefit Plaintiff, including, but not limited to, those that govern the National Oil and Hazardous Substances Contingency Plan, *see, e.g.,* 40 C.F.R. § 300.150. BP failed to adhere to the requirements for response actions established by the National Contingency Plan, 29 C.F.R. § 1910.20. BP therefore breached its responsibilities under this regulatory provision.

60. In addition, the federal Bureau of Safety and Environmental Enforcement ("BSEE") found that BP violated the following federal regulatuibs:

a. BP failed to protect health, safety, property, and the environment by failing to perform all operations in a safe and workmanlike manner, in violation of 30 C.F.R. § 250.107(a)(1);

b. BP did not take measures to prevent unauthorized discharge of pollutants into offshore waters, in violation of 30 C.F.R. § 250.300;

c. BP failed to take necessary precautions to keep the well under control at all times, in violation of 30 C.F.R. § 250.401(a);

d. BP did not cement the well in a manner that would properly control formation pressures and fluids and prevent the direct or indirect release of fluids from any

14

        stratum through the wellbore into offshore waters, in violation fo 30 C.F.R. §§ 250.420(a)(1) and (2);

e.     BP failed to conduct an accurate pressure integrity test, in violation of 30 C.F.R. § 250.427;

f.     BP failed to maintain the *Deepwater Horizon's* BOP system in accordance with the American Petroleum Institute's Recommended Procedure 53 section 18.10.3, in violation of 30 C.F.R. § 250.446(a);

g.     BP failed to obtain approval of the Temporary Abandonment procedures it actually used at the Macondo well, in violation of 30 C.F.R. § 250.1721(1);

h.     BP failed to conduct an accurate pressure integrity test at the 13-5/8" liner shoe, in violation of 30 C.F.R. § 250.427; and

i.     BP failed to suspend drilling operations at the Macondo well when the safe drilling margin identified in the approval application for the permit to drill was not maintained, in four separate violations of 30 C.F.R. § 250.427(b).

61.     BP's violations of these statutory and/or regulatory standards constitute negligence *per se* under federal law, as well as general maritime law.

62.     BP had actual and/or constructive knowledge of the facts and circumstances leading to and causing the incidents described herein, which in turn caused Plaintiff's injuries, and their actions and inactions were grossly negligent, reckless, wilful and/or wanton.

63.     As a direct and proximate cause of BP's violation of statutory and/or regulatory standards, the Plaintiff has suffered injuries and is entitled to actual and punitive damages.

## V.  PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment against Defendants as follows:

1. compensatory damages in amounts to be determined at trial;

2. actual damages including, but not limited to:
   a. past and future loss wages;
   b. past future medical expenses;
   c. past and future loss of personal services; and
   d. past and future intangible losses, including those for pain and suffering.

3. punitive damages;

4. pre-judgment and post-judgment interest at the maximum rate allowable by law;

5. attorney's fees and costs of litigation; and

6. any other relief the Court deems just and proper.

        Respectfully submitted,

          /s/ Timothy J. Falcon
        Timothy J. Falcon, Esq.
        Louisiana Bar Roll No. 16909
        FALCON LAW FIRM
        5044 Lapalco Boulevard
        Marrero, LA 70072
        Telephone: 504.341.1234
        Facsimile: 504.341.8115
        Email: tim@falconlaw.com

        and

        Allen W. Lindsay, Jr., Esq.,
        Florida Bar Roll No. 104956
        LINDSAY & ANDREWS
        5218 Willing Street
        Milton, FL 32570
        Telephone: 850.623.3200
        Facsimile: 850.623.0104
        Email: awl@lal-law.com

        *Attorneys for Plaintiff,*
        *Michael Brandon Vickers*

**PLEASE SERVE**:

**BP America Production Company,**
through its registered agent:
C. T. Corporation System
5615 Corporate Blvd., Suite 400B
Baton Rouge, LA 70808

**BP Exploration & Production, Inc.**,
through its registered agent:
C. T. Corporation System
5615 Corporate Blvd., Suite 400B
Baton Rouge, LA 70808

**BP P.L.C.**,
through its registered agent:
C. T. Corporation System
5615 Corporate Blvd., Suite 400B
Baton Rouge, LA 70808

18